Council for Appellee, please come forward. Appellee, after you. Good morning, Your Honor. Frederick Landers, representing NAPLI, Atlantis Water Solutions, and IAFINA Resources. Please proceed. I think we wanted appellant. You said appellee. Oh, I said appellee. I'm sorry. I'm having one of those days. Please introduce yourself. Thank you, Your Honor. My name is Ben Sather. I'm an attorney in Billings, Montana, and I'm here on behalf of the appellants Steve and Shelley Baldwin of Culberson, Montana. How much time do you wish to reserve for a rebuttal? Five minutes, Your Honor. I'll tell you then. Please go. Thank you, sir. This matter was filed in Roosevelt County, Montana, as an action by my clients, the Baldwins against IAFINA Resources, a British corporation, and Atlantis LLC, a Montana limited liability company. The matter was litigated for some time, and Atlantis, the LLC, filed for bankruptcy protection about halfway through the litigation. It proceeded to an adversary proceeding in front of Judge Hirsch in Montana, and that's why we're here today. So it's not a typical bankruptcy case, but it's a privilege for me to be able to come from little town Montana to be here in front of you all today. So thank you. Getting right into it, the standard that we are asking this panel to apply is a mixed standard of review based on the In Re Store case, which was a bankruptcy case ruled on by Judge Ralph Kersher in 2007 in Montana. And it melds the concept of corporate veil piercing on an LLC. The issue in this case is piercing the protections of an LLC. And in Montana, at least, that's a relatively new concept in the sense that there is not a lot of case law, not a lot of common law for us to rely on with respect to piercing the LLC. Conversely, there are decades of cases and opinions on the issue of piercing the corporate veil. And when presented with that issue in 2007 in the In Re Store case, Judge Kersher melded the two together and found that the best course of action was to look at corporate veil standards in determining whether or not the LLC protections should be pierced. And that's – there's a lot of briefing back and forth on what should apply, what standards should apply, and that's the standard where the – Counsel, can I interrupt you for a second? First of all, whenever a lawyer tells me he's from a small town in Montana, I instinctively check my wallet. Why wasn't there an oral argument on this case? I found that since it was such a novel issue and there wasn't really settled law, I was curious to find that the judge didn't ask for oral argument. Is there some reason for that? There is no reason, Your Honor, and I don't have an explanation. I think that counsel for the FLE would agree that this happened very quickly and the court simply ruled. I didn't ask for it and neither did the defendants, and perhaps we should have, but it was never discussed. Go ahead. Is that the practice that you ask for oral argument or you don't get it? Is that the practice in Montana? Yes. Okay, so no request was made. No request was made, and that's a recent development in Rule 56 in Montana. I see. And you say that the case law that has been developed with reference to corporations should be treated differently than LLCs, is that correct? Because they're different, is that correct? My position is that for this case, they should be treated the same, Your Honor. The same? Yes. Well, you're saying that LLCs should be treated under the cases that deal with piercing the corporate veil. Correct. All right. Don't you need to establish some sort of fraud under either standard? That's a good question, Your Honor, and in Montana you do not. And this is why, and I'll come right out and say it, this is why it's so important for this case, for my clients to prevail. I believe we prevail under both the Weaver case, which is the LLC case the employees are relying on, and that was a case I took to the Montana Supreme Court five years ago. We would prevail on that, but more supportive of our position is this case called the Peschel Family Trust and the Toynias case. Those are two Montana Supreme Court cases that say you don't have to reach that level of fraud in order to pierce the corporate veil. That bad faith alone is sufficient. Well, what's the bad faith here, though? The bad faith is entering into a contract that you don't have the assets to pay. That ends up with a very broad result, right? I mean, there's a great many companies that make contracts expecting to obtain financing. You sign a real estate purchase contract on the expectation you'll get a mortgage that will allow you to pay the debt. Is that fraud? I don't believe it's fraud, but under this circumstance, I believe it is bad faith because we're not talking about, in Peschel and Toynias, those involve small corporations and individuals. In this case, we're talking about IAFINA, which is a publicly traded company worth millions and millions of dollars that absolutely had the ability then and today to pay this lease. They go out and set up an LLC, don't fund it even though they could, don't create employees even though they could, don't even create a bank account. Even all these things they could have done, which they didn't do, I believe constitutes bad faith. It's not fraud. Of course, your client could also have bargained for a guarantee from IAFINA and for whatever reason didn't. Aren't you basically asking to get the equivalent of a guarantee which you didn't bargain for? Your client, I mean. They certainly could have bargained for that, yes, Your Honor. And conversely, IAFINA and Atlantis could have bargained for a condition in the lease that says if we don't get approval from the Department of National Resources and Conservation in Montana, we're out. And that was bargained for and discussed and was not part of the consideration exchange. So I do agree with you, but it does go both ways. Going back to your point, wouldn't your point mean that whenever a parent company is essentially always going to be liable for the debts of its subsidiary if its subsidiary becomes insolvent? You seem to be arguing that the parent, if it can, always has an obligation to put enough money into the sub to permit the sub to carry out its debts. Is that really the law? I don't think that's the law, Your Honor. But in this situation, when looking at the totality of this situation, when they could have done these things and then enter into a seven-figure lease with a Culbertson, Montana family who, you know, this was during the Bakken, which was the oil boom. They had opportunities to do other things and could have used this land in other ways and didn't, and I think when you look at those factors, Your Honor, they had the opportunity to do this the right way and didn't do it. What do you mean the right way? The right way, Your Honor, is to fund the LLC and create an entity, hire employees, do all the things that create an identity for this LLC. This LLC had nothing, has nothing. Every person my clients dealt with, every person they spoke to, was affiliated with IAFINA. Every check they got was from IAFINA. Every e-mail address was from IAFINA. But they signed the lease with whom? With Atlantis. So they knew that this was an LLC they were dealing with? Correct. And your client, the lawyer for your client drafted all the documents. IAFINA wasn't represented by counsel in the transactions. It was all, the documents were all generated by your client. Yes, my client's former counsel drafted the documents. I can't say whether or not these folks were represented by counsel on that. I just don't know. So that leads me into my next, the next part of this argument, which is this concept of undercapitalization. And undercapitalization can be, I guess, defined in a lot of ways. It's a very broad concept. But here in this case, undercapitalization is no capitalization. And the Peschel Family Trust case says undercapitalization alone is sufficient to breach the corporate veil or to pierce the corporate veil. And that's what we're, that's our argument today. Well, what exactly is undercapitalization? I mean, IAFINA did put hundreds of thousands of dollars into the project, most of which went to your client, as that money was needed. But it also didn't put in as much money as was necessary to cover all of Atlantis' debts. Does undercapitalization mean not enough money to cover all the debts or something else? I think that's a two-part answer. The first is they never capitalized the actual LLC. So that's the undercapitalization there. And then second, yes, that they didn't put in enough money to satisfy the debts they had. Doesn't that, in effect, make the parent always liable for the subsidiary's debts if the parent always has to put in enough capital to cover all the subsidiary's debts? It could, Your Honor, and I understand where you're going with that. And that's not under, that's not the law. And I agree with you on that. And that's important. And I think it's the specific and unique facts of this case which provide us with that undercapitalization argument, that this LLC was just a shell. It was nothing. And as a general rule of law, you are absolutely right. And the parent cannot be liable for the subsidiary in every situation if they don't pay. Counsel, you have about five minutes left. Do you want to reserve that? I will reserve. Thank you. Thank you, Your Honor. So, Counsel, why should LLCs be treated differently than corporations? Why are they different? Well, under Montana law, there are statutes that expressly state that the management of his affairs are not grounds for imposing personal liability on the members. We have this body of law that's common to most states where you set up kind of a sham corporation that doesn't have assets, doesn't have employees. It's just a shell that that kind of corporate entity can be pierced. Why shouldn't that be true of these other new entities that have come into play? Well, I think the court did touch on something, a significant flaw with regard to my opponent's argument, and that is they're essentially stating that IAFINA should have fully pre-funded Atlantis' future obligations under this lease, and that would require an initial infusion of capital around, I think, $1.5 million, which is a total amount that was to be paid over 10 years on this lease. Now, the reason that wasn't done was because Atlantis had a business plan, and that plan was to secure a water permit, take water, sell it in commercial quantities to the companies that are working in the oil and gas fields and generate income, and that income would be used to fund its current and future obligations. Well, I don't hear them to say that your client has acted in bad faith or fraudulently. What I hear them to say is that, as in the law of corporations, that the LLC had to have an actual existence. It had to have a bank account. It had to have employees. It had to have something to demonstrate that it wasn't more than just nominally existent. And in the absence of actual existence, it does not effectuate any protection for the parent. I think that's what they're saying. Well, I think that is what they're saying, but what the appellants are trying to do is graft the law of piercing the veil of corporations onto LLCs, which are an entirely different animal. Now, the first prong under that corporate veil piercing test is the alter ego or agency test, and that, under Montana law, has 10 or 14 different factors that courts apply where they look at, was this subsidiary truly an entity that existed on its own? Did it have its own source of funds and management and so forth? As we've explained in our brief, under the LLC law, which recognizes single-member LLCs, it's understood that single-member LLCs essentially would be an extension of the parent company or the members, such as it is, and that, therefore, it's trying to apply that first prong of the corporate test to an LLC, which is allowed to operate informally, is like trying to put a square peg into a round hole. So what the appellants are asking this panel to do is something that the Montana Supreme Court has never even come close to doing, and that's to pierce the veil of an entity, whether a corporation or an LLC, based on the mere failure of the business. When there is indisputably no fraudulent or bad faith conduct at any point during the company's existence. And to pierce the veil. Let me stop you on that because the result in this case gives you exactly the result you would have had if your client had an option to terminate the lease or the option or both if the water permits were denied. You didn't get that. I don't know if you bargained for it or not, but it's not in the deal. But this result gives you that exact same result. So why is it equitable to give you a result which you didn't get or didn't even bargain for in the contract negotiations? Well, and the appellants have tried to turn this issue around on us, I think. And we say, well, why didn't you bargain for a personal guarantee? You're represented by counsel. You knew this was a startup company and that was engaged in a speculative venture. They say, well, you could have put an out into the agreement that allowed you to terminate. Well, if you go back and review the timeline and facts of how this project went down, the failure of Atlantis was due to an unforeseen event, which is a change in the law related to water permits. My clients, you know, they did investigate and do their due diligence on this opportunity. The water permit was thought to be a slam dunk that would take a 6- to 12-month process. They hired the best water rights lawyer in the state to shepherd through this process. Now, an objection was filed by a competitor that put the process on a different, longer track. And then during that interim period, the policy changed. That was the cause of the denial of the water permit. The option agreement was originally set up to have a one-year exercise period. The water permit process was expected to take 6- to 12-months. So had that gone to plan, Atlantis' permit would have been in hand. It would have had full project financing, which was estimated to be around $20 million. Had that in place by the end of the option period, IAFINA never would have had to make a single payment on that lease, and the payments would have come from Atlantis generating its own income and standing on its own two feet. So that was, you know, the failure of the business was unanticipated. Because the option period was intended to line up with the permit process, I don't think my client probably felt there was a need to have an out of that option. I don't hear anyone saying that your client has acted in bad faith or fraudulently. If this entity had been a corporation, would they be able to pierce it? The absence of assets, the absence of employees? I don't think so, Your Honor. Because there was no fraud. No fraudulent intent or bad act. Now, the second prong of that veil-piercing test was pretty much the same, whether you adopt the LLC test under the Weaver case that we cite or the corporate veil-piercing test under the Peschel and Tonia's cases and NRA Store that the appellants cite. And by the way, NRA Store was decided by the Montana Bankruptcy Court six years before the Weaver case came out on LLC law. But the second part of the test under both of those competing doctrines requires that the corporation was used under the corporate test as a subterfuge to defeat public convenience, justify wrong, or perpetuate fraud. And the party seeking to pierce a veil must put forth substantial evidence of that. And under the LLC test, it's whether the member operates an LLC as an empty shell to perpetuate fraud and avoid personal liability. So both of those tests do require some element of fraud or wrongful conduct. Counsel points to cases where they would indicate that the absence of funding the entity and providing it with the ability to avoid payment by keeping it empty satisfies that test. You don't find that persuasive? I do not, Your Honor. And as we've cited in our brief, unfortunately Montana has never delved into the issue of undercapitalization per se in this context. Other courts that have say if undercapitalization were by itself sufficient to pierce the veil, then the veil of every insolvent subsidiary company could be pierced. So we believe undercapitalization is at the outset, we're not agreeing that Atlantis is undercapitalized here. Iofina advanced funds during that initial startup period, which was only intended to last approximately six to 12 months. And from Iofina's perspective, those advancements were infusions of capital that were, obviously the Baldwins benefited from this. Those payments went directly to the Baldwins. So they cannot, I think, credibly argue that they were harmed by Atlantis' initial lack of capital or separate funds from a bank account. But, you know, the Tonia's case, one of the things that bothers me about this whole area is the Tonia's case relied partly on the fact that the parent had pulled assets out of the subsidiary towards the end. And that would be troublesome, but is it really any different to simply not put assets in in the first place than to pull them back out later on? Is there any real difference in substance? Well, we submit that there is a difference, and that's what the Supreme Court focused on in Tonia's and Peschel, was that the subsidiary or subsidiary companies entered into obligations or incurred debt. After that, there was this antecedent diversion of funds back out of the company that the court, I believe, found was intended to harm the creditors and leave the company without money to pay its creditors. If you contrast that kind of conduct to what we have in this case, where IAFINA and Atlantis both used their best efforts to get this business up and running. It failed for reasons that were largely outside of their control. And in hindsight, I think it's easier for the appellants to say, well, you should have set Atlantis up with enough money to pay this obligation for the next 10 years. But in reality, that's just not how business is done. So, and again, the facts on Tonia's and Peschel v. Colonna obviously are egregious, such that the court did find that fraudulent or wrongful conduct that resulted in harm or actually was part of a scheme to cheat the corporation's creditors. So I'll briefly address the equity considerations. The Baldwins can see that they were not cheated or deceived at any point in this process. They've already received $459,000. My clients have never turned a shovel on their property, and they never will. The Water Depot project failed for reasons that were outside of Atlantis IAFINA's control. Baldwins could have asked for a guarantee before entering into the agreement. Now they're asking the court to give them an apt-to-the-fact guarantee, and it would be inequitable to pierce the veil under these circumstances. So we ask this panel to reject the appellant's argument to remake Montana laws and, in effect, undermine the doctrine of limited liability and instead affirm the bankruptcy court's decision. Thank you. Thank you very much. Counsel. Counsel. Thank you. I'll touch on opposing counsel's points briefly. Judge Ferris asked the question of essentially a timing of this, of is it a distinction without a difference if you pull out the money later as opposed to never putting the money into the shell in the first place. And our position on that under Peschel-Antonius is that it is a distinction without a difference, that why should the defendants get the benefit of the fact they never put money in there to distinguish from the facts of Peschel-Antonius where the money was moved around after the fact. And certainly, whenever a party is looking at a judgment being entered against them and they start moving money around, the smell of fraud and deceit is much stronger on the surface. But when you look at this, it really, to me, is no different. They never funded it in the first place. Well, isn't that the distinction, though? At the end of the life of a company, the parent or owner says, oh, my God, things are going bad. I've got to get my money out before the creditors can get to it. And that kind of self-dealing is what is being responded to in the Peschel-Antonius case. And that didn't exist here. Your client admitted that they had no bad motive, they had no bad intent. It was the problem was is that the law changed while they were in the process of getting their permits. And that was an unforeseen, you know, business circumstance that could not have been avoided. And up until that point, things were fine. So isn't there actually really a difference here? And respectfully, Judge Brand, I disagree because, and let me back up by quoting this language directly from Peschel, which says that first, the second prong for piercing the corporate veil does not require a specific finding of fraudulent intent. And my client was asked a question in his deposition as to, do you think IAFINA was out to defraud you? And he truthfully said, no, I think they had the best intentions. And that's why I'm relying on these cases to say you may have the best intentions, but under the law of Peschel-Antonius, the veil can still be pierced. It's like a strict liability for undercapitalization rule to me then. You have the best of intentions, things went wrong, but you still have to pay like there's a guarantee. And I think the lesson learned, Your Honor, is that for a large corporation like IAFINA, if they want to come into Montana and enter into contracts with individual landowners, this case will give a lesson. And that lesson is, set up a separate LLC, don't fund it at all, and if the project goes bad, just declare bankruptcy and you're good to go. And that's the result that has occurred here. And to me, respectfully, that is bad faith and falls under the Peschel-Antonius umbrella. There's also a lesson for the Montana landowners, and that is, get that foreign corporation to guarantee the deal. Certainly. Is there some, we use the word fraud, is there some requirement, even under your analysis, for some kind of bad conduct for something? I mean, this really comes down to the essence of your argument is this is a sham. This is a sham entity. And because it's a sham entity, we can pierce it. But you're dealing with the entity that you contracted with. I mean, I guess what we're struggling with is how those poor landowners in Montana have been mistreated. The person with whom they contracted the LLC was exactly the person that they were told they were being contracted with. And they knew that was a separate entity and it was distinct from the parent. I guess, is there bad conduct here that we're missing? Well, I think there's a yes and no answer to that, Judge. The entity they thought they were contracting with was IAFINA. The word Atlantis came up at the end of all of this. Oh, I see. I mean, and I think that's really important here. And my clients entered into a $1.45 million deal and got paid $450,000. $450,000 is a lot of money, and we don't deny that. But there still is a breach of contract, which they are the victim of. And I think it's difficult to say that my clients got a huge windfall when we could talk for hours about the North Dakota-Montana oil boom and the money people made from that, that they lost their opportunity. Unfortunately, we don't have hours to talk about it now. Your time is up. Thank you very much. Thank you so much. Thank you, Counsel. Thank you for your excellent arguments today. This matter is submitted.
judges: Kurtz, Faris, Brand